**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA AND LORRAINE HAW | : No. 4 MAP 2021 |
| | : |
| | : Appeal from the Order of the |
| | : Commonwealth Court dated January |
| v. | : 7, 2021 at No. 578 MD 2019. |
| | : |
| | : ARGUED: September 21, 2021 |
| VERONICA DEGRAFFENREID AS ACTING SECRETARY OF THE COMMONWEALTH | : |
| | : |
| | : |
| | : |
| | : |
| APPEAL OF: SHAMEEKAH MOORE, MARTIN VICKLESS, KRISTIN JUNE IRWIN AND KELLY WILLIAMS | : |
| | : |

## OPINION

**JUSTICE TODD**                                    **DECIDED: December 21, 2021**

In this direct appeal, we review the Commonwealth Court's entry of a permanent injunction blocking the Secretary of the Commonwealth from certifying the results of the November 5, 2019 election in which the voters of the Commonwealth were asked to approve a proposed "victim's rights amendment," described as "Marsy's Law," which would be added as a new provision of Article I of the Pennsylvania Constitution – Section 9.1 ("Victim's Rights Amendment"). The Commonwealth Court entered its injunction on the basis that the Victim's Rights Amendment violated the requirement of Article XI, Section 1 of the Pennsylvania Constitution that, "[w]hen two or more amendments shall be submitted they shall be voted upon separately." Pa. Const. art. XI, § 1. After careful review, we affirm the decision of the Commonwealth Court, because, for the reasons we

detail herein, the Victim's Rights Amendment was, in actuality, a collection of amendments which added a multiplicity of new rights to our Constitution, and, because those new rights were not interrelated in purpose and function, the manner in which it was presented to the voters denied them their right to consider and vote on each change separately, as Article XI, § 1 mandates. We, therefore, affirm the decision of the Commonwealth Court.

## I. Background

We emphasize at the outset that our decision does not address the wisdom of the multifarious provisions of the Victim's Rights Amendment, or the policy choices giving rise to them; rather, our obligation in this matter is solely to resolve the question of whether the amendment, as presented to the voters of this Commonwealth in the November 5, 2019 general election, complied with the inviolable "separate vote" requirement of Article XI, § 1 that "[w]hen two or more amendments shall be submitted they shall be voted upon separately." Pa. Const. art. XI, § 1.

In June 2019, after having been previously approved in the 2018 legislative session, Senate Bill 1011 of 2018 was adopted by both houses of the General Assembly as Joint Resolution 1 of 2019 (hereinafter "Joint Resolution 2019-1."). It amends Article I of the Pennsylvania Constitution by adding the following wholly new provision:

§ 9.1. Rights of victims of crime.

(a) To secure for victims justice and due process throughout the criminal and juvenile justice systems, a victim shall have the following rights, as further provided and as defined by the General Assembly, which shall be protected in a manner no less vigorous than the rights afforded to the accused: to be treated with fairness and respect for the victim's safety, dignity and privacy; to have the safety of the victim and the victim's family considered in fixing the amount of bail and release conditions for the accused; to reasonable and timely notice of and to be present at all public proceedings involving the criminal or delinquent conduct; to be notified of

any pretrial disposition of the case; with the exception of grand jury proceedings, to be heard in any proceeding where a right of the victim is implicated, including, but not limited to, release, plea, sentencing, disposition, parole and pardon; to be notified of all parole procedures, to participate in the parole process, to provide information to be considered before the parole of the offender, and to be notified of the parole of the offender; to reasonable protection from the accused or any person acting on behalf of the accused; to reasonable notice of any release or escape of the accused; to refuse an interview, deposition or other discovery request made by the accused or any person acting on behalf of the accused; full and timely restitution from the person or entity convicted for the unlawful conduct; full and timely restitution as determined by the court in a juvenile delinquency proceeding; to the prompt return of property when no longer needed as evidence; to proceedings free from unreasonable delay and a prompt and final conclusion of the case and any related postconviction proceedings; to confer with the attorney for the government; and to be informed of all rights enumerated in this section.

(b) The victim or the attorney for the government upon request of the victim may assert in any trial or appellate court, or before any other authority, with jurisdiction over the case, and have enforced, the rights enumerated in this section and any other right afforded to the victim by law. This section does not grant the victim party status or create any cause of action for compensation or damages against the Commonwealth or any political subdivision, nor any officer, employee or agent of the Commonwealth or any political subdivision, or any officer or employee of the court.

(c) As used in this section and as further defined by the General Assembly, the term "victim" includes any person against whom the criminal offense or delinquent act is committed or who is directly harmed by the commission of the offense or act. The term "victim" does not include the accused or a person whom the court finds would not act in the best interests of a deceased, incompetent, minor or incapacitated victim.

Joint Resolution 2019-1.[1]

---

[1] This package of proposed constitutional changes is also known as "Marsy's Law,"

The then-Secretary of the Commonwealth, Kathy Boockvar,[2] drafted the text of the question for this proposed amendment as it appeared on the ballot in the November 5, 2019 election ("Ballot Question"), and twice published it in newspapers in each county. The Ballot Question read in full:

> Shall the Pennsylvania Constitution be amended to grant certain rights to crime victims, including to be treated with fairness, respect and dignity; considering their safety in bail proceedings; timely notice and opportunity to take part in public proceedings; reasonable protection from the accused; right to refuse discovery requests made by the accused; restitution and return of property; proceedings free from delay; and to be informed of these rights, so they can enforce them?

Ballot Question (Plaintiff's Exhibit 1 offered in Oct. 23, 2019 hearing in *League of Women Voters v. Boockvar*, 578 M.D. 2019 (Pa. Cmwlth. 2019)).

On October 10, 2019, Appellees[3] (collectively referred to as "the League") filed a

---

named after a murder victim, Marsalee ("Marsy") Nicholas, who was murdered by her ex-boyfriend in 1983. Anna Roberts, "Victims, Right?," 42 *Cardozo Law Review* 1449, 1458 (2021). As of the beginning of 2021, eleven states have adopted a similar package of amendments. *Id.* However, in two other states, Montana and Wisconsin, the amendments, though approved by their voters, were deemed to have violated those states' constitutions in the manner in which the proposed amendments were presented to the voters. *See Montana Association of Counties v. State by & through Fox,* 404 P.3d 733 (Mont. 2017), and *Wisconsin Justice Initiative v. Wisconsin Election Commission*, 2019-CV-3485 (Wis. Cir. Ct. Dane County filed November 3, 2020). An appeal remains pending in the latter case.

[2] Subsequently, Ms. Boockvar resigned, and her successor, acting Secretary Veronica DeGraffenreid, was substituted as a party in this suit. She has not filed a brief in this matter.

[3] Appellees are the League of Women Voters, Lorraine Haw, and Ronald Greenblatt. The League is a nonprofit organization whose central focus is the education of individuals on issues related to elections and voting. Haw is a registered voter whose brother was murdered, has a son serving a life sentence without parole, and who is seeking a pardon of her own for a criminal conviction. Greenblatt is a criminal defense attorney with over 30 years of practice experience. They have filed a joint brief herein. Greenblatt, although granted the right to intervene below, was never added to the caption.

declaratory judgment action in the Commonwealth Court and sought to preliminarily enjoin the tabulation and certification of the votes on the Victim's Rights Amendment, alleging that it violated Article XI, § 1.[4]  The matter was assigned to Judge Ellen Ceisler, who conducted an evidentiary hearing and heard argument on the motion.  On October 30, 2019, Judge Ceisler issued an order granting the requested preliminary injunction and enjoining the Secretary "from tabulating and certifying the votes in the November 2019 General Election relating to the ballot question asking voters whether the Pennsylvania Constitution should be amended to include a new section providing for victims' rights until final disposition of the Petition for Review, including appeals."  *League of Women Voters v. Boockvar*, 578 M.D. 2019 (Pa. Cmwlth. filed Oct. 30, 2019) (order).

Thereafter, Appellants[5] filed an emergency motion with our Court seeking to overturn Judge Ceisler's order.  After expedited review, we affirmed the preliminary injunction.  *League of Women Voters v. Boockvar*, 219 A.3d 594 (Pa. 2019) (order).[6]

---

[4]  Appellees also alleged that the Ballot Question violated Article XI, §1 because it failed to contain the actual text of the Victim's Rights Amendment, and that it should be stricken because neither the Proposed Amendment, the Ballot Question, nor the Attorney General's Plain English Statement, *see* 25 P.S. § 2621.1 (requiring that, for all proposed constitutional amendments, the Attorney General prepare a statement in plain English which indicates the purpose, limitations and effects of the ballot question," and requiring the Secretary of the Commonwealth to publish it along with the proposed constitutional amendment), did not "fairly convey the substance of the proposed amendment."  Petition for Review filed in *League of Women Voters v. Boockvar*, 578 M.D. 2019 (Pa. Cmwlth.), at 21.

[5]  Appellants are four individuals who were granted intervenor status by the Commonwealth Court as victims of crimes.

[6]  Then-Chief Justice Saylor authored a brief dissent to this order, joined by Justices Dougherty and Mundy, in which he expressed his disagreement with the legal standards employed by the Commonwealth Court to evaluate the League's request for a preliminary injunction, *i.e.*, whether they had presented a substantial question that a violation of Article XI, § 1 had occurred.  Justice Saylor also indicated that he would have vacated the portion of the Commonwealth Court's order which restrained the Secretary from tabulating or counting the votes cast.

However, we stressed that neither our order, nor the order of the Commonwealth Court, prohibited any voter from voting on the Ballot Question. *Id.*

Consequently, the Ballot Question appeared on the ballot in the November 5, 2019 General Election. On the Secretary's website, the unofficial tally of all votes cast on this question count was listed as 74.01% in favor of the question and 25.99% against; however, pursuant to the terms of Judge Ceisler's order, the Secretary did not formally tabulate or certify these results.

Thereafter, the parties filed cross motions for summary relief, and, on January 7, 2021, a divided *en banc* panel of the Commonwealth Court granted the League's request for declarative relief based on its determination that the proposed Victim's Rights Amendment violated Article XI, § 1, and, because it was unconstitutional, the court declared all votes cast on it to be invalid. *League of Women Voters v. Boockvar*, 578 M.D. 2019 (Pa. Cmwlth. filed Jan. 7, 2021) (order).[7] Accordingly, the court entered a permanent injunction enjoining the Secretary from tabulating or certifying the votes cast in the election.[8]

By way of background necessary for understanding the analysis employed by the Commonwealth Court below and the arguments advanced by the parties before us, we first discuss our Court's jurisprudence addressing the separate vote requirement of Article XI, § 1. As here, in each of the decisions we discuss, the challenges to the proposed

---

[7] The court denied Appellees' other bases for seeking declaratory relief, *see supra* note 4, as moot.

[8] The court's order was accompanied by an unpublished memorandum decision by Judge Ceisler in support of the order, joined by Judge Wojcik and Judge McCullough. *See League of Women Voters v. Boockvar*, 578 M.D. 2019 (Pa. Cmwlth. filed Jan. 7, 2021) (opinion announcing the judgment of the court). Judge McCullough also authored a concurring opinion. Then-President Judge Leavitt wrote a dissent, joined by Judge Fizzano Cannon.

amendments at issue were reviewed by our Court after the electorate had voted.

Over two decades ago, in *Bergdoll v. Kane*, 731 A.2d 1261, 1264-65 (Pa. 1999), we considered a ballot question with two aspects:  one proposed amending Article I, § 9 of our Constitution to replace the right of a person accused of a crime to "meet the witnesses face to face" with a right to be "confronted with the witnesses against him"; the other proposed amending Article V, § 10(c)[9] – which governs our Court's exclusive authority to establish rules of court procedure – to allow the General Assembly to enact laws regarding the manner by which children may testify in criminal proceedings, including to permit the use of videotaped depositions or testimony by closed-circuit television.

---

[9]  This section provides:

> The Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts, justices of the peace and all officers serving process or enforcing orders, judgments or decrees of any court or justice of the peace, including the power to provide for assignment and reassignment of classes of actions or classes of appeals among the several courts as the needs of justice shall require, and for admission to the bar and to practice law, and the administration of all courts and supervision of all officers of the Judicial Branch, if such rules are consistent with this Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant, nor affect the right of the General Assembly to determine the jurisdiction of any court or justice of the peace, nor suspend nor alter any statute of limitation or repose.  All laws shall be suspended to the extent that they are inconsistent with rules prescribed under these provisions.  Notwithstanding the provisions of this section, the General Assembly may by statute provide for the manner of testimony of child victims or child material witnesses in criminal proceedings, including the use of videotaped depositions or testimony by closed-circuit television.

Pa. Const. art. V, § 10(c).

In reviewing the text of the ballot question, we identified two purposes for that proposed amendment:

> First, it seeks to ensure that the language of the Pennsylvania Constitution gives the accused no greater a right to confront witnesses than the right to confront witnesses given the accused under the United States Constitution. Second, it seeks to ensure that, notwithstanding the constitutional right of the accused to confront witnesses, the General Assembly is authorized by the Pennsylvania Constitution to enact laws regarding the manner by which children may testify in criminal proceedings.

*Id.* at 1270. Because of these disparate purposes, our Court ruled that the ballot question violated the separate vote requirement of Article XI, § 1 in that it "encompassed amendments to both Article I, § 9 and Article V, § 10(c), but did not permit the electorate to vote separately upon each of the amendments." *Id.*

Justice Saylor authored a concurring opinion in which he agreed that the ballot question was "constitutionally infirm." *Id.* at 1271 (Saylor, J., concurring). However, he indicated that he would have reached this conclusion by employing a different rationale – specifically, that the provision of the proposed amendment which expanded the means by which child witnesses could offer testimony could have done so without altering the face-to-face requirement of Article I, § 8. Thus, in his view "the changes lacked the interdependence necessary to justify their presentation to voters within the framework of a single question." *Id.* In support, he cited with approval decisions from Nevada and Utah which employed an analysis for determining whether a proposed amendment violates the separate vote requirements of their respective constitutions by examining both whether the proposed changes relate to each other in subject matter, and also whether each provision is dependent on the other to function. *See id.* (discussing *Clark v. State Canvassing Bd.,* 888 P.2d 458, 462 (Nev. 1995) (ballot question violated the separate vote requirement of the Nevada Constitution where two proposed changes, while relating

to the subject of gambling, had no "rational linchpin" of interdependence); *Lee v. State,* 367 P.2d 861, 864 (Utah 1962) (holding that a two-part proposed amendment granting the legislature special powers in the event of a war or other emergency violated the separate vote requirement, which was then part of the Utah Constitution, because the two provisions, though related, were not dependent upon each other)).[10]

Then, in *Pennsylvania Prison Society v. Commonwealth*, 776 A.2d 971 (Pa. 2001) ("*Prison Society*"), we again considered the issue of whether a single ballot question proposing multiple revisions to our Constitution violated Article XI, § 1. The ballot question in that case asked the voters whether they approved amending Article IV, § 9(b) of our Constitution

> to require a unanimous recommendation of the Board of Pardons before the Governor can pardon or commute the sentence of an individual sentenced in a criminal case to death or life imprisonment, to require only a majority vote of the Senate to approve the Governor's appointments to the Board, and to substitute a crime victim for an attorney and a corrections expert for a penologist as Board members?

*Id. at* 974.

A majority of our Court agreed on the foundational legal principles governing our review of a claim that a proposed amendment violates Article XI, § 1. However, we did not reach a consensus on the proper analysis. In a lead opinion authored by Justice Zappala – joined by Justice Flaherty and joined, in part, by Justice Nigro – the plurality found that the analysis in *Bergdoll* was controlling, inasmuch as, in its view, the question before our Court was whether the proposed amendments, even though presented as

---

[10] Six years after the *Lee* decision, in 1969, the Utah Constitution was amended to remove the requirement, which existed at the time *Lee* was decided, that "If two or more amendments are proposed, they shall be so submitted as to enable the electors to vote on each of them separately." Utah Const. art. XXIII, § 1 (1959-1969).

changes to but a single article of our Constitution, nevertheless violated Article XI, § 1 because they constituted multiple amendments to our Constitution that the voters were not given the opportunity to vote on separately. *Prison Society*, 776 A.2d at 981. In conducting its analysis of this issue, the plurality explicitly rejected the appellants' argument that the changes to Article IV did not violate the separate vote requirement because they all related to a single subject. The plurality noted that our Constitution differed from those of other states which explicitly require that proposed constitutional amendments all relate to a "single subject," due to the fact that our Constitution contains no such requirement. *Id.* at 981 n.4.

Ultimately, the plurality found that the proposed amendment violated Article XI, § 1 because, even though the amendment purportedly changed only one article of our Constitution, it had two separate purposes: restructuring the pardoning power of the Parole Board, and altering the Pennsylvania Senate's confirmation process for the governor's appointees. The plurality found that "the senatorial process for confirming the governor's appointees is separate and distinct from the functions performed by the Board." *Id.* at 981. Correspondingly, in the plurality's view, "[a]ny change to the Senate's exclusive authority to confirm the appointees to the Board was required to be submitted for a separate vote by the electorate." *Id.* However, despite this violation of Article XI, § 1, the plurality nonetheless determined that the amendment, while technically void, should stand because it did not actually alter the existing confirmation procedure under Article IV, § 9: in the plurality's view, the Senate already had the power to appoint the Board's members by majority vote.

In a concurring and dissenting opinion, Justice Nigro agreed that the proposed amendment violated Article XI, § 1, but he disagreed with the plurality's conclusion that it could nevertheless stand, and he would have stricken the amendment as void.

Former Justice Cappy dissented. He first concluded that the amendment did alter the senatorial confirmation process, and, therefore, required a separate ballot question. He next repudiated the plurality's conclusion that the constitutional violation was a form of "harmless error." *Id.* at 987 (Cappy, J., dissenting). While agreeing with the plurality that *Bergdoll* requires that our Court strictly enforce the separate vote requirement of Article XI, § 1, he nevertheless considered the plurality's excuse of this violation to circumvent this requirement.

Justice Saylor authored a single-sentence concurring opinion, joined by Justices Castille and Newman, in which he agreed with the plurality that the proposed amendments did not violate Article XI, § 1, but he also disavowed the plurality's "rejection of a subject-matter focus to determine whether alterations are sufficiently interrelated to justify their presentation to the electorate in a single question." *Id.* at 984 (Saylor, J., concurring). In a footnote, Justice Saylor, as in *Bergdoll*, briefly summarized jurisprudence from other jurisdictions that utilize such a single-subject test:

> I note that jurisdictions interpreting virtually identical constitutional requirements have employed a single-subject test and examined the interdependence of the proposed constitutional changes in determining the necessity for separate votes. *See, e.g., Korte v. Bayless,* 199 Ariz. 173, 16 P.3d 200, 203–05 (2001) (explaining a "common-purpose formulation" to inquire into whether the proposed amendments are sufficiently related to "constitute a consistent and workable whole on the general topic embraced"); *Clark v. State Canvassing Bd.,* [*supra*] (applying a "rational linchpin" of interdependence test); *Sears v. State,* 232 Ga. 547, 208 S.E.2d 93, 100 (1974) (inquiring into whether all of the proposed changes "are germane to the accomplishment of a single objective") (quotations and citations omitted); *Fugina v. Donovan,* 259 Minn. 35, 104 N.W.2d 911, 914 (1960) (upholding separate propositions that, although they could have been submitted separately, were rationally related to a single purpose, plan, or subject).

*Id.* at 984 n.1.

In *Grimaud v. Commonwealth*, 865 A.2d 835 (Pa. 2005), our Court's most recent opinion in this area, we addressed two ballot questions that were challenged as violating the separate vote requirement of Article XI, § 1.[11] The first question ("Question 1") proposed to amend Article I, § 14 to disallow the granting of bail "when the proof is evident or presumption great that the accused committed an offense for which the maximum penalty is life imprisonment *or* that no condition or combination of conditions other than imprisonment of the accused will reasonably assure the safety of any person and the community," *id.* at 841 (emphasis added), and the second ("Question 2") proposed amending Article I, § 6 of our Constitution to provide "that the Commonwealth shall have the same right to trial by jury in criminal cases as does the accused," *id.* at 845.

In addressing appellants' claim that Question 1 violated Article XI, § 1, our Court observed that our decision in *Prison Society* produced no clear majority regarding the applicable standard and, thus, we adopted *in toto* Justice Saylor's brief concurring opinion from *Prison Society*:

> We are persuaded by Justice Saylor's concurrence suggesting "a subject-matter focus to determine whether alterations are sufficiently interrelated to justify their presentation to the electorate in a single question." [*Prison Society*, 776 A.2d] at 984 (Saylor, J., concurring, joined by Castille and Newman, JJ.). Persuasive authority comes from other jurisdictions which have utilized
>
> > a single-subject test and examined the interdependence of the proposed constitutional changes in determining the necessity for separate votes. *See, e.g., Korte v. Bayless,* [*supra* (Arizona)] (explaining a "common-purpose formulation" to inquire into whether the proposed amendments are sufficiently related to "constitute a consistent and workable whole on the general topic embraced"); *Clark v. State Canvassing Bd.,*

---

[11] Both questions appeared separately on the ballot used by the voters.

> [*supra* (New Mexico)] (applying a "rational
> linchpin" of interdependence test); *Sears v. State,*
> [*supra* (Georgia)] (inquiring into whether all of the
> proposed changes "are germane to the
> accomplishment of a single objective")
> (quotations and citations omitted); *Fugina v.
> Donovan,* [*supra* (Minn.)] (upholding separate
> propositions that, although they could have been
> submitted separately, were rationally related to a
> single, purpose, plan, or subject).
>
> *Id.,* at 984 n. 1; *see also Manduley v. Superior Court,* 27
> Cal.4th 537, 117 Cal.Rptr.2d 168, 41 P.3d 3, 28 (2002)
> (various provisions must be reasonably related to common
> theme or purpose); *Fine v. Firestone,* 448 So.2d 984, 990
> (Fla.1984) (amendment must manifest "a logical and natural
> oneness of purpose ...").[12]
>
> Although we are not bound by these decisions, we find them
> persuasive, and adopt the "subject matter test" for determining
> whether a ballot question violates Article XI, § 1.

*Grimaud*, 865 A.2d at 841.

Applying this test, we concluded that Question 1 did not violate the separate vote requirement of Article XI, § 1 because the proposed changes set forth in the ballot question – the first clause disallowing bail where the offense warrants life imprisonment, and the second disallowing bail where the public safety requires it – "were related to a single subject, bail" and "were *sufficiently interrelated* (all concerned disallowance of bail to reinforce public safety) to justify inclusion in a single question." *Id.* (emphasis added). Notably, however, we did not specify what degree of interrelatedness between the

---

[12] This decision involved the article of Florida's Constitution governing proposed amendments placed on the ballot by an initiative of the voters, and that portion of Florida's Constitution, unlike Pennsylvania's, contains a requirement that any amendment proposed by initiative "shall embrace but one subject and matter directly connected therewith." Fla. Const. art. 11, § 3. Also, unlike our Constitution, Florida's Constitution contains no requirement that when two or more amendments are proposed by the legislature they shall be voted on separately. *Id.* §§ 1, 5.

proposed changes was required by Article XI, § 1, or how it should be measured.

Despite having found that the proposed changes set forth in Question 1 were sufficiently interrelated, we addressed the appellants' argument that it violated Article XI, § 1 because the question "implicitly amended" several provisions of the Constitution, specifically:

> (1) Article I, § 1's right to defend one's self, by restricting the ability to prepare a defense; (2) Article I, § 9's presumption of innocence, because preventive detention requires a presumption the accused will commit additional crimes if released on bail; (3) Article I, § 13's right to be free from excessive bail, because preventive detention essentially eliminates that right; and (4) Article I, § 25's reservation that Article I rights remain inviolate, because preventive detention punishes without trial and conviction, violating Article I, § 9.

*Id.* at 842.

In addressing this claim, our Court opined:

> We analyze the ballot question's substantive affect [sic] on the Constitution, examining the content, purpose, and effect. *Pennsylvania Prison Society,* at 980. Here, the Commonwealth Court properly noted that merely because an amendment "may possibly impact other provisions" does not mean it violates the separate vote requirement. *Grimaud* [v. *Commonwealth,* 806 A.2d 923 (Pa. Cmwlth. 2002)] at 930. The test to be applied is not merely whether the amendments might touch other parts of the Constitution when applied, but rather, whether the amendments *facially* affect other parts of the Constitution. Indeed, it is hard to imagine an amendment that would not have some arguable effect on another provision; clearly the framers knew amendments would occur and provided a means for that to happen. The question is whether the single ballot question patently affects other constitutional provisions, not whether it implicitly has such an effect, as appellants suggest.

*Id.* (emphasis original). Ultimately, we concluded:

> The bail amendments do not *substantively affect* the right to defend one's self, the right to be free from excessive bail, or the reservation that Article I rights remain inviolate. The

argument concerning the amendment of Article I, § 9's presumption of innocence lacks merit because the "presumption" language is the same now as it was prior to the amendments. *See* Pa. Const. art. I, § 14 (1997). Because the proposed amendments only patently affected Article I, § 14, regarding when bail is disallowed in criminal cases, and no other part of the Constitution, the Commonwealth Court did not err in concluding the single bail ballot question was properly submitted to the electorate.

*Id.* (emphasis added).

We next addressed Question 2. Textually, Question 2 set forth only one change: providing the Commonwealth with a right to trial by jury in criminal cases. Nevertheless, as with Question 1, we addressed the appellants' argument that the question violated Article XI, § 1 because it implicitly amended several provisions. The appellants argued that granting the Commonwealth the right to trial by jury violated Article XI, § 1 because it also amended Article V, § 10(c) (governing judicial administration),[13] and Article I, § 25,[14] which reserves all of the rights enumerated in Article I to the people. To resolve this claim, we examined whether the change to Article I, § 6 effectuated by the proposed amendment substantially altered those other constitutional provisions. *Id.* at 845. We determined that it would not, inasmuch as "[o]nly one substantive change is made . . . to give the Commonwealth the right to trial by jury." *Id.* (citing *Prison Society*, 776 A.2d at 980).

---

[13] *See supra* note 10.

[14] This section provides:

> To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate.

Pa. Const. art. I, § 25.

Chief Justice Cappy authored a concurring and dissenting opinion in *Grimaud*, joined by Justice Nigro and then-Justice, now-Chief Justice, Baer. Chief Justice Cappy characterized the majority's adoption of a "subject matter test" as conflicting with the analysis our Court employed in *Bergdoll*, which he interpreted as requiring only that a court examine how many ways a ballot question would change the constitution and then ascertaining whether "the ballot question permitted the electorate to vote separately upon each of the amendments." *Id.* at 849 (Cappy, C.J., dissenting). Thus, he considered this apparent repudiation of *Bergdoll* to be unjustified under the doctrine of *stare decisis*. Chief Justice Cappy further expressed his concern that the "sufficiently interrelated" test adopted by the Majority would "make constitutional amendment a guessing game as to the predilections of a majority of Justices regarding just how 'sufficiently interrelated' amendments need to be to pass constitutional muster." *Id.*

Although Chief Justice Cappy found Question 2 not to violate Article XI, §, 1, he did so on the basis of his conclusion that it did not present separate amendments. He then sharply criticized the majority's Article XI, § 1 analysis generally, calling it "hopelessly vague and therefore largely unhelpful, as it offers three different and seemingly inconsistent inquiries, *i.e.*, whether the proposed amendments 'facially' affect, 'patently' affect and/or 'substantively' affect, other parts of the Constitution." *Id.* at 850 n.3.

In sum, our decision in *Grimaud* stands for the proposition that, under its single subject test, a determination of whether a proposed amendment making multiple changes to the Pennsylvania Constitution violates Article XI, § 1 requires a reviewing court to examine whether the changes are "sufficiently interrelated to justify their presentation to the electorate in a single question." *Grimaud*, 865 A.2d at 841-842. We view this as the core holding of *Grimaud*. In addition, however, *Grimaud* also allows that a proposed

amendment triggers the separate vote requirement of Article XI, § 1 if it substantively effectuates more than one change to the Constitution. *Grimaud*, 865 A.2d at 842.

With this background in mind, we turn to the Commonwealth Court's decision in the case at bar. Because the question of whether the proposed Victim's Rights Amendment violated Article XI, § 1 arose in the context of the League's request for a permanent injunction, in her lead opinion, Judge Ceisler determined that the League had established the criteria for the entry of a permanent injunction set forth in *Board of Revision of Taxes, City of Philadelphia v. City of Philadelphia*, 4 A.3d 610, 627 (Pa. 2010) (holding that "a permanent injunction will issue if the party establishes his or her clear right to relief" and "if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law"). Specifically, she found that the League had met its burden for establishing a clear right to relief because it had established that the Victim's Rights Amendment violated Article XI, § 1 of our Constitution.

In her opinion, she first discussed *Bergdoll* and *Prison Society* and noted that, subsequent to those decisions, our Court in *Grimaud* adopted the interrelationship test set forth in Justice Saylor's concurrence in *Bergdoll* as the governing standard for challenges under Article XI, § 1, and she proceeded to apply that test.[15] *See League of*

---

[15] Judge Ceisler remarked that she did not view *Grimaud* as directly controlling the outcome of this matter given that *Grimaud* involved amending an existing constitutional provision, whereas, here, an entirely new constitutional provision is being proposed. *League of Women Voters v. Boockvar*, 578 M.D. 2019 at 15 (quoting *Sprague v. Cortes*, 145 A.3d 1136, 1145 (Pa. 2016) (opinion in support of granting plaintiff's relief) ("There is a categorical difference between the act of creating something entirely new and altering something which already exists.") (emphasis deleted)). Appellants presently argue that Judge Ceisler disregarded the *Grimaud* subject matter test and, instead, improperly followed the test at issue in *Sprague* which examined whether the language of a ballot question was sufficiently clear so as to apprise the voter of what changes he or she is being asked to make. Appellants' Brief at 19. We respectfully disagree, because we interpret Judge Ceisler's citation to the opinion in *Sprague* merely as support for her general observation about the greater impact adding new provisions can have on existing

*Women Voters v. Boockvar*, 578 M.D. 2019 at 15 (Pa. Cmwlth. filed Jan. 7, 2021) (opinion announcing the judgment of the court) ("These decisions instruct that in deciding whether a proposed amendment is constitutional, courts must determine whether it encompasses a single subject that is *sufficiently interrelated*.") (emphasis original).[16]

Accordingly, Judge Ceisler proceeded to examine the content, purpose, and effect of the Victim's Rights Amendment and whether all of its provisions were sufficiently interrelated to encompass a single subject. Based on the evidence she had received at the preliminary injunction hearing and the parties' filings, she analyzed in great detail the sweeping and complex changes the Victim's Rights Amendment would have on existing constitutional provisions and the criminal justice process in Pennsylvania.

Judge Ceisler first observed that the Victim's Rights Amendment would have significant effects on the right of the accused in a criminal prosecution to confront the witnesses against him and the right to compulsory process to obtain witnesses in his favor secured by Article I, § 9 of the Constitution. She noted that the Victim's Rights Amendment would allow not only a victim of a crime to refuse interviews, deposition, or discovery requests, but would also allow any person directly impacted by a crime to refuse to comply with such requests,[17] as well as refuse to produce physical or documentary

constitutional rights, inasmuch as, in our view, she applied the *Grimaud* interrelationship test in her analysis.

[16] Judge Ceisler also briefly noted the Commonwealth Court's declaration in its own decision in *Prison Society* – which, as discussed above, we reversed – that the process set forth in Article XI, § 1 "should not be used to circumvent a constitutional convention, the process for making complex changes to the Constitution." *Pennsylvania Prison Society v. Commonwealth,* 727 A.2d 632, 634 (Pa. Cmwlth. 1999). The Governor has filed a thoughtful and comprehensive *amicus* brief in which he endorses this principle. However, the issue we presently review does not require that we address that assertion.

[17] As we discuss herein, *see infra*, the proposed amendment actually uses the terms "directly harmed by the commission of the offense or act" in defining "victim." *See* Joint Resolution 2019-1(c).

evidence which would help the accused mount a defense. Thus, in her view, the granting of such a right of refusal to these individuals, rooted in the Victim's Rights Amendment's stated purpose of protecting the "safety, dignity and privacy" interests of the individual, would hinder attorneys representing an accused from obtaining evidence necessary to mount a defense, and from obtaining a court order to compel victims to produce evidence or testimony. *League of Women Voters v. Boockvar*, 578 M.D. 2019 at 18 (opinion in support of order announcing the judgment of the court). She considered this to be an alteration of a defendant's right of confrontation under Article I, § 9, and, because of the impact on the discovery process, a corresponding alteration of the right to a speedy trial under that same provision. These changes, she reasoned, could interfere with a defendant's ability to negotiate plea agreements, and constrain his ability to effectively cross-examine witnesses.

Judge Ceisler also found that the victim's right to privacy conferred by the Victim's Rights Amendment could affect the accused's right to open court proceedings conferred by Article I, § 11 of the Constitution. In her view, this new privacy right could interfere with the ability of courts to conduct pretrial and trial proceedings, altering this Court's exclusive rulemaking power under Article V.

Judge Ceisler next noted that the notification and participation rights conferred on victims regarding prisoner releases would alter the operations of the Department of Corrections and county jails. In this regard, she reasoned that individuals who had completed their sentence and who are scheduled for release would be the most impacted, as they would continue to be incarcerated until the requisite notice and opportunity to be heard was provided. Similarly altered, in her view, would be the right of the accused to bail secured by Article I, § 14, the right of the Governor to commute sentences and to

grant pardons under Article IV, § 9, and a court's power to order a prisoner's release under rules established by our Court pursuant to Article V.

Judge Ceisler concluded that, because the Victim's Rights Amendment, on its face, addresses a vast array of subjects – such as bail, discovery, due process, restitution, the right of privacy, and the courts' powers to control the conduct of criminal proceedings and to promulgate rules – the various provisions of the Victim's Rights Amendment could not be deemed to be sufficiently interrelated so as to be brought under the subject of "victims' rights." As a result, she determined that the Victim's Rights Amendment deprived the voters of their right to choose which of the multiple changes they approved or disapproved, and therefore violated Article XI, § 1.

In an opinion supporting the court's order, Judge McCullough joined Judge Ceisler's opinion, and she agreed that the wide range of subject matter covered by the Victim's Rights Amendment lacked the required interdependence to be considered as pertaining to a single subject. She rejected the suggestion that these subjects could be grouped together under the broad and amorphous category of "victims' rights" as, from her perspective, that was entirely too broad a category to encompass such seemingly unrelated changes. She analogized this to legislation which our Court found violative of Article III, § 3 of the Constitution because it grouped together multiple unrelated subjects into the general class of "municipalities." *League of Women Voters v. Boockvar*, 578 M.D. 2019 at 4-5 (opinion in support of order announcing the judgment of the court) (McCullough, J) (citing *City of Philadelphia v Commonwealth*, 838 A.2d 566 (Pa. 2003)).

Judge McCullough further opined that, even if all of these provisions could be grouped together under the umbrella of victims' rights, the manner in which the Victim's Rights Amendment was presented — as a single ballot question — still violated Article XI, § 1 because that constitutional provision requires that a voter be given a chance to

vote on each amendment to the Constitution separately. Judge McCullough also discounted the argument that all of these proposed harms were merely speculative, given that, in her view, the deleterious impact on the right of the accused to obtain witnesses and other evidence necessary to prepare a defense secured by Article I, § 9 was patent.

Judge Leavitt dissented, contending that declaratory relief was inappropriate as the League had merely asserted speculative harms that may occur if the amendment was passed, but, in her view, it did not meet its burden of producing evidence showing concrete real-world injury that would transpire if the amendment took effect. Judge Leavitt considered the mere possibility that an amendment would impact other constitutional provisions insufficient to violate Article IX, § 1; rather, she concluded it was necessary under *Grimaud* to show that there was a demonstrable deleterious effect on those other provisions, which, from her perspective, the League did not do.

Appellants filed a direct appeal to our Court.[18] We granted oral argument, which was held on September 21, 2021, limited to the following issue:

> Whether the Commonwealth Court erred as a matter of law in declaring that the Proposed Amendment to Article I of the Pennsylvania Constitution, as set forth in Joint Resolution No. 2019-1, violated Article XI, Section 1 of the Pennsylvania Constitution, because the Proposed Amendment was contained in only one ballot question?

*League of Women Voters v. Boockvar*, 4 MAP 2021 (Pa. filed June 22, 2021) (order)

## II. Arguments of the Parties

Appellants argue that the Victim's Rights Amendment comports with the "sufficiently interrelated" standard our Court articulated in *Grimaud* for Article XI, § 1

---

[18] Before us, and in response to the other two challenges raised by Appellees below, *see supra* note 4, Appellants argue that there is no requirement that a proposed amendment be recited verbatim in a ballot question, and that the Ballot Question adequately apprised the voters of the changes they were voting on. Given our resolution of Appellees' challenge under Article XI, § 1, we need not address these other issues.

challenges. Appellants highlight the fact that, in *Grimaud*, our Court rejected the notion that proposed amendments violate Article XI, § 1 merely because they "implicitly" affect other provisions of the Constitution. Appellants point to a passage in that opinion where we stated that "[t]he test to be applied is not merely whether the amendments might touch other parts of the Constitution when applied, but rather, whether the amendments facially affect other parts of the constitution." Appellants' Brief at 12 (quoting *Grimaud*, 865 A.2d at 842). Hence, in their view, our Court categorized the determinative inquiry as "whether the single ballot question patently affects other constitutional provisions, not whether it implicitly has such an effect." *Id.* Thus, Appellants proffer that, in *Grimaud*, we upheld the proposed amendment altering the conditions under which bail may be granted because the amendment modified only Article I, § 14 of the Constitution, governing bail, but did not explicitly alter Article I, § 9, establishing the presumption of innocence. Appellants posit this reasoning has particular relevance in the instant matter, given that the Victim's Rights Amendment does not alter the innocence presumption language in Article I, § 9. Hence, in their view, to consider the Victim's Rights Amendment's effects on that section, like Judge Ceisler did in her lead opinion below, is improper.

Appellants contend that the multiplicity of rights conferred on victims by the Victim's Rights Amendment are sufficiently interrelated to justify placing them in one ballot question as they serve one common purpose — "to enshrine a panoply of indispensable victims' rights in the Pennsylvania Constitution." *Id.* at 15-16. Appellants reiterate that, because none of the language in any of the other provisions of the Constitution, which the lead opinion below discussed, is explicitly changed by the amendment, the Ballot Question meets the *Grimaud* standard. Appellants, thus, reject Judge Ceisler's and Judge McCullough's opinions as flawed for examining the amendment's implicit effects on other constitutional provisions; conversely, they wholly endorse Judge Leavitt's

opinion as hewing faithfully to this standard, given that she would have required a demonstration of the Victim's Rights Amendment's patent effects on those constitutional provisions.

Appellants argue that "applying the formulations found 'persuasive' in *Grimaud*, the 15 victims' rights clearly have a 'common purpose' and are 'germane to the accomplishment of a single objective'" which, they submit, is "to enshrine a panoply of related victims' rights in the Pennsylvania Constitution." *Id.* at 16 (quoting *Grimaud,* 865 A.2d 841). Appellants, thus, ask us to reverse the Commonwealth Court decision and order.[19]

The League counters Appellants' description of the *Grimaud* test by pointing out that, in that case we articulated a two-step analysis: the first step is to determine whether a proposed amendment encompasses a single subject – whether its provisions are sufficiently interrelated to justify inclusion in a single ballot question; the second step requires an examination of whether a proposed amendment patently affects other constitutional provisions. The League maintains that this inquiry is not, however, restricted only to assessing whether a proposed amendment alters the language of other constitutional provisions, but, rather considers the "content, purpose and effect" of the proposed amendment on those provisions to determine if it makes "more than 'one substantive change'" to the Pennsylvania Constitution. League's Brief at 19 (quoting *Grimaud*, 865 A.2d at 842)). The League argues the Victim's Rights Amendment fails both parts of this inquiry.

With respect to the single subject requirement, the League contends the Victim's Rights Amendment fails this requirement, as, in its view, the amendment combines no

---

[19] *Amicus* briefs were filed in support of Appellees by the Attorney General, the Pennsylvania Coalition Against Rape, and the Pennsylvania District Attorneys Association.

less than 14 separate amendments into one, by creating these particular new victim's rights:

- to be treated with fairness and respect for the victim's safety, dignity and privacy;
- to have the safety of the victim and the victim's family considered in fixing the amount of bail and release conditions for the accused;
- to reasonable and timely notice of and to be present at all public proceedings involving the criminal or delinquent conduct;
- to be notified of any pretrial disposition of the case;
- to be heard in any proceeding where a right of the victim is implicated, including, but not limited to, release, plea; sentencing, disposition, parole and pardon;
- to be notified of all parole procedures, to participate in the parole process, to provide information to be considered before the parole of the offender, and to be notified of the parole of the offender;
- to reasonable protection from the accused or any person acting on behalf of the accused;
- to reasonable notice of any release or escape of the accused;
- to refuse an interview, deposition or other discovery request made by the accused or any person acting on behalf of the accused;
- full and timely restitution from the person or entity convicted for the unlawful conduct;
- to the prompt return of property when no longer needed as evidence;
- to proceedings free from unreasonable delay and a prompt and final conclusion of the case and any related post-conviction proceedings;
- to confer with the attorney for the government; and
- to be informed of all rights enumerated in this section.

*Id.* at 4-5 (quoting Joint Resolution 2019-1).

The League asserts that these rights affect the entire range and scope of the

criminal process, from start to finish, and encompass multiple subject areas that are so complex they are taught as separate courses in law school, and are treated separately by our Constitution, statutes, and caselaw. In its view, grouping them together under the generic and amorphous category of "victims' rights" would render the single subject requirement essentially meaningless, and it would allow a limitless number of constitutional amendments to be combined together in clear violation of Article XI, § 1.

The League proffers that *Grimaud* itself underscores what it characterizes as the fallacy of Appellants' argument, because, the League reasons, had we simply applied their overly broad formulation of a unifying category of "victim's rights" in that case, there would have been no need for separate questions on the issue of amending the right to trial by jury and amending the right of the accused to bail, as both could have been unified under this capacious category, or another equally amorphous one such as "commonwealth rights" or "criminal justice procedures." League Brief at 13, n.2. Instead, each separate ballot question in that case passed the requirement of Article XI, § 1 only because each pertained to one narrow constitutional provision — the right to trial by jury, and the right to bail, respectively. By contrast, the Victim's Rights Amendment affects multiple subjects, such as the right to bail, the parole process, discovery, and restitution.

The League also points out that *Grimaud* did not write on a clean slate, but, rather built on our Court's earlier jurisprudence in *Prison Society* and *Bergdoll*. In *Prison Society*, the League highlights that our Court examined the purpose of each provision of the proposed amendment at issue and found that, because each provision accomplished a different purpose, the various provisions, when considered as a whole, could not be deemed to pertain to a single subject. Here, the League argues, each of the new victims' rights enumerated above furthers a separate and distinct purpose and, thus, cannot be viewed as accomplishing the singular purpose of providing justice and due process for

victims, as Appellants argue.

Additionally, the League asserts that, in his concurrence in *Bergdoll*, Justice Saylor elaborated on the concept of the degree of interrelationship between various provisions necessary to group them under a single subject. The League notes that Justice Saylor focused on whether each provision could stand separately and independently of the others, which necessitated examining whether each provision implicated the same fundamental right. The League insists that Justice Saylor indicated that he did not find the requisite degree of interdependence in that case between the provision eliminating the face-to-face requirement of Article I, § 9, and the provision permitting the legislature to enact procedures to present a child's testimony at trial. Justice Saylor observed that the former provision affected only the manner in which an accused could confront a child witness, whereas the latter included a broader category of rights going beyond the right of confrontation; hence, because each provision could stand independently of the other, they could not be viewed as interrelated.

The League posits that the provisions of the Victim's Rights Amendment suffer from this same defect, in that they enumerate and target certain distinct rights covering distinct topics. For instance, the right to participate in parole proceedings is targeted at post-trial processes, whereas the right to refuse to participate in discovery is targeted at pretrial ones. Moreover, the right to privacy of the victim which the Victim's Rights Amendment secures is much broader than the individual rights to participate in the aforementioned pretrial and post-trial processes. Thus, the League reasons that the Victim's Rights Amendment, like the proposed amendment in *Bergdoll*, impermissibly affects two categories of rights – one specific, the right of participation, and one general, the right of privacy. Hence, it contends that the amendment fails to meet this constitutional standard.

Further, the League argues, each of the proposed new rights can stand independently of one another, thus, they should have been submitted as separate amendments. The League proffers that, for example, some voters may have wanted to allow a victim to participate in bail hearings, but may not have wanted to restrict the right of the accused to discovery. Consequently, the League reasons, each voter should have been given the opportunity to vote separately on each of these constitutional changes.

Turning to the question of whether the Victim's Rights Amendment patently affects other provisions of the Constitution, the League emphasizes that this analysis cannot be restricted, as Appellants suggest, to a rote examination of whether a proposed amendment explicitly alters the language of other constitutional provisions. The League notes that, in *Grimaud*, we used the term "facially" in conjunction with the terms "substantively" and "patently," and used the terms interchangeably. *Id.* at 20. Rather, the League contends this question turns on whether a proposed amendment "substantively affects" other provisions of the Constitution, requiring a consideration of the "content, purpose and effect" of a proposed amendment on those other provisions. *Id.* at 23. The League reasons that, had we intended in *Grimaud* to require an explicit textual change, we would have simply said so, and would not have required a consideration of the substantive effect of the proposed changes on other constitutional provisions.

The League also points out that *Grimaud* did not purport to overrule *Bergdoll*, which considered the substantive effect that the challenged amendment had in that case on our rulemaking power under Article V, and found that it constituted an "amendment" of that provision, even though the proposed amendment did not in any way alter the language and text of Article V. *Id.* at 21. The League posits that, if this were not the case, then the legislature could evade the requirement of Article XI, § 1 merely by taking care to craft an amendment that did not alter the text of other constitutional provisions, while

nevertheless effectuating wholesale changes to them in substance.

The League avers that the Victim's Rights Amendment patently, *i.e.*, substantively, affects the following disparate constitutional provisions: (1) our Court's exclusive rulemaking power under Article V § 10(c), given that the Victim's Rights Amendment would allow the General Assembly to establish procedures whereby victims could assert their rights under this amendment at various phases of court proceedings, such as bail, discovery, and the grant of pretrial release; (2) the right of the defendant to compulsory process secured by Article I, § 9, given that the Victim's Rights Amendment would deprive an accused of the right to compel testimony or the production of documents in support of his defense when a victim asserts their right to not testify or to shield certain records; (3) the right to bail secured by Article I, § 14, as the Victim's Rights Amendment would impose criteria beyond those currently provided for in that section for release on bail, such as providing the victim the right to participate in bail hearings and considering the wishes of the victim in setting bail; and (4) the Governor's pardon powers under Article IV, § 9.

The League contends that these multiple substantive changes should have been presented to the voters individually, as Article XI, § 1 requires, so that they could have considered each of the changes separately. This, it argues, is in accordance with what the framers of that amendment intended: a clear, simple choice for voters when asked to amend their charter of governance, which they may exercise on careful reflection. This intent is not effectuated when, as here, the League asserts, the voter is forced to simultaneously consider multiple unrelated changes aggregated together.[20]

---

[20] In support of the League, *amicus* briefs were filed by the Juvenile Law Center, the National Association of Criminal Defense Lawyers, the Pennsylvania Association of Criminal Defense Lawyers, and the Pennsylvania News Media Association.

## III. Analysis

As we discussed above, under *Grimaud*'s subject matter test, a proposed constitutional amendment which makes multiple changes to our Constitution violates Article XI, § 1 if those changes are not "sufficiently interrelated." *Grimaud*, 865 A.2d at 841-42, 845. We acknowledge, however, that we did not elaborate on the required degree of interrelationship between multiple changes made by a proposed amendment in order for it to comply with Article XI, § 1. As discussed at greater length *infra*, the cases from other jurisdictions enumerated in the footnote from *Prison Society,* which we adopted wholesale in *Grimaud*, reflect a divergence of views regarding the contours of the test to be employed to determine the requisite degree of interrelationship or interdependence. Moreover, the *Grimaud* court did not assess which of those states' approaches to determining interrelatedness best effectuates the fundamental purpose of Article XI, § 1. Inasmuch as the parties in the present matter dispute the proper formulation and application of *Grimaud's* subject matter test in analyzing the issue before us, we will begin by further explicating the parameters of this test.

### A. Article XI, Section 1 and Interpretive Principles

We commence our analysis by reaffirming the bedrock principle that it is our Court's duty under the Pennsylvania Constitution "to insure that the provisions of the Constitution establishing the procedure for the proposal and adoption of constitutional amendments are satisfied." *Prison Society*, 776 A.2d at 977. Indeed, our "Constitution is the fundamental law of our Commonwealth, and in matters relating to alterations or changes in its provisions, the courts must exercise the most rigid care to preserve to the people the right assured to them by that instrument." *Id.* (quoting *Commonwealth ex rel. Schnader v. Beamish,* 164 A. 615, 616-17 (Pa. 1932) (internal quotation marks omitted)).

Further, in analyzing issues involving alleged violations of Article XI, § 1, we are

guided by the overarching principle that

> the voters should be given free opportunity to modify the fundamental law as may seem to them fit, but this must be done in the way they themselves have provided, if stability, in the carrying on of government, is to be preserved. It is the duty of the courts to follow the rules fixed by the Constitution. If [these rules are] believed [by the people] to be unwise, in the provisions expressed, it should be rewritten, or modified, but as long as plain words are used, directing what shall be permitted, it is imperative on the courts to restrain any actions which are forbidden.

*Id.* at 978 (quoting *Taylor v. King,* 130 A. 407, 409–10 (Pa. 1925)).

Other than a constitutional convention, the only method by which our fundamental charter may be amended is that established by Article XI, § 1, which mandates a specific and detailed process that must be followed in order for an amendment to become a binding part of our organic law.[21] *Id.* at 978. Our Court's duty to ensure scrupulous adherence to the provisions of Article XI, § 1, is, therefore, of utmost importance as these provisions are indispensable for the stability of our peaceful, democratic system of governance. *Id.*; *see also Gabbert v. Chicago, R.I. & P. Railway Co.*, 70 S.W. 891, 897 (Mo. 1902) ("[T]he mode established by the constitution for its amendment must be followed; that it is a limitation upon the power of the legislature and people alike.").

Article XI, § 1 provides, in relevant part:

### § 1. Proposal of amendments by the General Assembly and their adoption

Amendments to this Constitution may be proposed in the

---

[21] The Pennsylvania Constitution establishes no formal procedure for the calling of a constitutional convention; however, our Court has reaffirmed the long-standing principle that "amendments to our prior and existing Constitution may be initiated by the calling of a Constitutional Convention, provided a majority of the electors vote in favor of such a call." *Stander*, 250 A.2d at 478; *accord in re: Angeles Roca First Judicial District Philadelphia County*, 173 A.3d 1176, 1185 (Pa. 2017).

Senate or House of Representatives; and if the same shall be agreed to by a majority of the members elected to each House, such proposed amendment or amendments shall be entered on their journals with the yeas and nays taken thereon, and the Secretary of the Commonwealth shall cause the same to be published three months before the next general election, in at least two newspapers in every county in which such newspapers shall be published; and if, in the General Assembly next afterwards chosen, such proposed amendment or amendments shall be agreed to by a majority of the members elected to each House, the Secretary of the Commonwealth shall cause the same again to be published in the manner aforesaid; and such proposed amendment or amendments shall be submitted to the qualified electors of the State in such manner, and at such time at least three months after being so agreed to by the two Houses, as the General Assembly shall prescribe; and, if such amendment or amendments shall be approved by a majority of those voting thereon, such amendment or amendments shall become a part of the Constitution; but no amendment or amendments shall be submitted oftener than once in five years. *When two or more amendments shall be submitted they shall be voted upon separately.*

\* \* \*

Pa. Const. art. XI, § 1 (emphasis added).[22]

---

[22] As discussed further herein, in 1967, the voters approved a proposed amendment adding present subsections a and b of Article XI, § 1 to allow the legislature, in the event of a "major emergency," to propose amendments to our Constitution when the safety and welfare of the Commonwealth require such amendments. Although not at issue in this appeal, it is noteworthy that these provisions retain the requirement that, if two or more such emergency amendments are submitted to the electorate for a vote, they shall be voted on separately:

(a) In the event a major emergency threatens or is about to threaten the Commonwealth and if the safety or welfare of the Commonwealth requires prompt amendment of this Constitution such amendments to this Constitution may be proposed in the Senate or House of Representatives at any regular or special session of the General Assembly, and if agreed to by at least two-thirds of the members elected to each House, a proposed amendment shall be entered on the journal of each House with the yeas and nays taken thereon and the official in charge of statewide elections shall promptly publish such proposed amendment in at least two

As discussed *supra*, the part of Article XI, § 1 at issue in this appeal is the above highlighted separate vote requirement, which commands that "two or more [proposed] amendments . . . shall be voted upon separately." *Id.* In interpreting this provision, we are guided by the fundamental precept that "[t]he Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *League of Women Voters v. Commonwealth*, 178 A.3d 737, 802 (Pa. 2018) (citations and internal quotation marks omitted).[23] Thus, "we must favor a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers and which reflects the views of the ratifying voter." *Id.*

However, "[w]e must look not only to the letter of the words but also the spirit behind them." *Prison Society*, 776 A.2d at 978 (quoting *Beamish*, 164 A. at 616). This is in furtherance of the important principle that:

> Where multitudes are to be affected by the construction of an instrument, great regard should be paid to the spirit and intention. And the reason for it is an obvious one. A constitution is made, not particularly for the inspection of lawyers, but for the inspection of the million, that they may read and discern in it their rights and their duties; and it is consequently expressed in the terms that are most familiar to them.

---

> newspapers in every county in which such newspapers are published. Such amendment shall then be submitted to the qualified electors of the Commonwealth in such manner, and at such time, at least one month after being agreed to by both Houses as the General Assembly prescribes.
>
> (b) If an emergency amendment is approved by a majority of the qualified electors voting thereon, it shall become part of this Constitution. When two or more emergency amendments are submitted they shall be voted on separately.

[23] Issues regarding an alleged violation of provisions of our Constitution are questions of law; hence, our standard of review is *de novo* and our scope of review is plenary. *Nextel v. Commonwealth*, 171 A.3d 682, 689 n.9 (Pa. 2017).

*Id.*

Accordingly, to discern the intent of the framers of a constitutional provision and that of the people of the Commonwealth who approved it, we must examine the historical circumstances which gave rise to the constitutional provision in question. *League of Women Voters v. Commonwealth*, 178 A.3d at 803. We may also consider "any relevant decisional law and policy considerations argued by the parties, and any extra-jurisdictional case law from states that have identical or similar provisions, which may be helpful and persuasive." *Id.*

### B. Historical Background

With these principles in mind, we begin by examining the historical motivations of the framers of our Constitution in adding a "separate vote" requirement for constitutional amendments during the 1837-1838 Constitutional Convention. Prior to that convention, the Constitution, as originally adopted by Pennsylvania's then-colonial government in 1776, provided a very limited means for changing its provisions – only a 2/3 vote of a body known as the "Council of Censors" could call a convention for such a purpose. Pa. Const. ch. II, § 47 (1776). However, the Council met at only seven-year intervals, and it did not fairly represent the population of the Commonwealth as a whole, given that its members were allocated to each of the Commonwealth's cities and counties equally, irrespective of their comparative populations. *Id.*

Such an amendment process was never successfully employed. A constitutional convention was called in 1790 by a vote of the General Assembly; however, that convention abolished the Council of Censors, while providing no alternate means of amendment. Kenneth Gormley *et al.*, *The Pennsylvania Constitution — A Treatise on Rights and Liberties* 850 (1st ed. 2004) (hereinafter, "Gormley"). The delegates to the 1790 convention, nevertheless, strengthened the language in the Constitution's

Declaration of Rights to firmly establish the people's sovereignty in choosing the manner in which they would be governed, declaring that:

> all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety and happiness; for the advancement of those ends, they have, at all times, an unalienable and indefeasible right to alter, reform or abolish their government in such manner as they may think proper.

Pa. Const. art. IX, § 2 (1790).

Thus, the principle that the people have the inviolable right to make the ultimate choice on whether their Constitution will be changed was firmly enshrined in our organic charter of governance. This tenet remains a bedrock principle of our present-day constitution, which likewise affirms:

> All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety and happiness. For the advancement of these ends they have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such manner as they may think proper.

Pa. Const. art. I, § 2.

Ironically, however, despite this declaration of popular sovereignty over matters of constitutional change, the 1790 constitution was never submitted to the people for a vote. Gormley at 850. Rather, it was first approved by vote of the delegates to the 1790 convention on February 6, 1790. Pennsylvania Constitution, *Official Website of the Pennsylvania General Assembly*, available at https://www.legis.state.pa.us/cfdocs/legis/li/constitution.cfm. Thereafter, the convention recessed in order to let the people discuss it amongst themselves; however, there was no formal process for the people to indicate whether they approved or disapproved of it. Nearly seven months later, on September 2, 1790, the convention reconvened, and the constitution was formally adopted when 63 of the 69 delegates signed it, after which they

adjourned.  *Id.*

Subsequently, there was popular clamor for reform of that charter, motivated by concern over issues such as the scope of the governor's appointment powers, and for the right to elect judges.  Rosalind L. Branning, *Pennsylvania Constitutional Development* 21 (1960) (hereinafter, "Branning").  From 1810 to 1831, the legislature was "flooded" with petitions demanding a new constitutional convention.  *Id.* at 21-22.  Although the legislature assented in a limited capacity during its 1824-25 session, the referendum it presented to the voters calling for a convention was rejected by them because the referendum provided no mechanism for the people to approve any constitutional changes which the convention might propose.  *Id.* at 22.  Finally, however, in 1835, in response to continuing public pressure, the legislature submitted a referendum to the voters for a convention which required that any amendments proposed by the convention must be ratified by the voters.

This convention assembled on May 2, 1837, and it worked for nearly seven months to make fundamental changes to the 1790 Constitution.  The convention delegates divided into nine committees, each tasked with studying and preparing a report on a particular provision of the Constitution, one of which was the means and methods by which the Constitution could be amended.  *Id.* at 23.

When that committee finished its work, its report suggesting the adoption of a new article governing the amendment process sparked vigorous debate, because the committee had decided that the legislature, and not the people, would control the process of proposing amendments.  This proposal conflicted with the perceived exclusive right of the people to change their charter of governance, as it transferred a key aspect of that procedure – the initiation and proposal of fundamental changes to the constitution – to the General Assembly.  Many delegates were concerned this devolution of this power to

the General Assembly would dilute the people's fundamental right to decide whether, or how, their Constitution should be changed. *See* 12 *Proceedings and Debates of the Convention of the Commonwealth of Pennsylvania, To Propose Amendments to the Constitution, Commenced at Harrisburg on May 2, 1837,* 78-84, 228-35, 307-11 (1837) (hereinafter "*Proceedings and Debates*").

The delegates' spirited debates reflected their intent to address these concerns, and, ultimately, they achieved a compromise by adopting a number of provisions designed to constrain the legislature's ability to propose amendments, and, at the same time, preserve the people's right to make the final decision as to whether any amendments proposed by the legislature would become effective. Gormley at 852. These provisions required: all proposed amendments be approved by two successive sessions of the General Assembly, which ensured that the people had the opportunity to express their wishes on whether they desired the passage of the proposed amendments in an election for their representatives; a majority of the people to approve, through election, any proposed amendment passed by the General Assembly; and a five-year limitation on how often the legislature could submit proposed amendments. Branning at 31.

Consistent with these restrictions, and evidencing an intent on the part of the delegates to ensure that each person voting on a proposed constitutional amendment be given the opportunity to fully understand the nature of the change or changes to the constitution it would produce, the delegates considered, and adopted, with no debate, the separate vote requirement. 12 Proceedings and Debates at 101. The purpose of this provision, as articulated by its author, John J. M'Cahen, a delegate from Philadelphia, and memorialized in the written proceedings of the convention, was to "prevent the legislature from connecting two dissimilar amendments, one of which might be good and

the other evil, and in consequence of which connexion [sic] the good which was wanted, might be rejected by the people rather than be taken with the evil which accompanied it." *Id.* No delegate offered opposition to this stated purpose, nor to its form or intended effect, and this proposed language was adopted by majority vote of the assembled delegates.

Thus, it is evident that the approval of M'Cahen's proposal by the delegates at the 1837-1838 Constitutional Convention reflected their intent to prohibit the practice of "logrolling" by the legislature in the crafting of a proposed amendment to be submitted to the voters. *See generally Cambria v. Soaries*, 776 A.2d 754, 764 (N.J. 2001) (describing logrolling of proposed constitutional amendments as the "practice of combining unrelated popular and unpopular proposals because voters will support the entire proposal in order to secure the passage of the part they favor"); *see also Kerby v. Luhrs*, 36 P.2d 549, 552 (Ariz. 1934) ("Two propositions cannot be united in the submission so as to have one expression of the vote answer both propositions, as voters might be thereby induced to vote for both propositions who would not have done so if the questions had been submitted singly.").

As the Supreme Court of Arizona cogently recognized in *Kerby*, logrolling is particularly "pernicious" when employed in the submission of proposed amendments to the electorate, inasmuch as a constitutional amendment has far-reaching consequences. *Id.* at 551. Indeed, unlike conventional legislation, undesired consequences of an amendment cannot be easily rectified by the people, as an amendment cannot simply be repealed by the legislature; instead, problematic amendments must be addressed by the adoption of a subsequent amendment, a lengthier process.

Further, and most importantly, the court in *Kerby* observed that logrolling in the passage of constitutional amendments has been disfavored by courts because it

constrains the ability of the electors to make a "free and mature judgment", as it is impossible for voters to express assent only to the provisions which they favor, and reject those which they disapprove. *Id.* at 554; *accord Andrews v. Governor of Maryland*, 449 A.2d 1144, 1153 (Md. 1982); *see also Grimaud*, 865 A.2d at 849 (Cappy, C.J., dissenting) ("[T]he focal point of Article XI, Section 1 clearly is to grant the voter the greatest freedom to decide upon amendments to our fundamental law.").

The separate vote requirement, along with other precise standards to be followed in the amendment process, once ratified by the delegates to the 1837-1838 Constitutional Convention, was submitted to the voters on October 9, 1838. The text of the proposed amendment presented to the voters in that election provided:

> **Amendments how made**.
>
> Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives; and if the same shall be agreed to by a majority of the members elected to each House, such proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon; and the Secretary of the Commonwealth shall cause the same to be published three months before the next election, in at least one newspaper in every county in which a newspaper shall be published; and if, in the Legislature next afterwards chosen, such proposed amendment or amendments shall be agreed to by a majority of the members elected to each House, the Secretary of the Commonwealth shall cause the same again to be published in manner aforesaid; and such proposed amendment or amendments shall be submitted to the people in such manner, and at such time, at least three months after being so agreed to by the two Houses, as the Legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments by a majority of the qualified voters of this State voting thereon, such amendment or amendments shall become a part of the Constitution; but no amendment or amendments shall be submitted to the people oftener than once in five years: *Provided, That if more than one amendment be submitted, they shall be submitted in such manner and form that the people may vote for or against each amendment separately and distinctly.*

Pa Const. art. X, § 1 (1838) (emphasis added).[24]  The amendment was approved by the voters in that election, and it became Article X, § 1 of the 1838 Constitution.

This constitutional provision was moved to Article XVIII, § 1 in the 1874 Constitution, which, as approved by the voters of the Commonwealth, maintained all of the restrictions from the 1838 amendment on the manner in which the legislature can propose new amendments, but also doubled the publication requirement for proposed amendments from one to two newspapers for each county, and changed the requirement "[t]hat if more than one amendment be submitted, they shall be submitted in such manner and form that the people *may* vote for or against each amendment separately and distinctly,"  Pa. Const. art. X, § 1 (1838-1874) (emphasis added), to its present requirement that "[w]hen two or more amendments shall be submitted they *shall* be voted upon separately."  Pa. Const. XVIII, § 1 (1874-1967) (emphasis added).[25]  Its language

---

[24]  The voters in this election were also presented with a copy of the original 1790 Constitution.  *See* Dr. Roy Akagi, *The Pennsylvania Constitution of 1838* at 331; The Pennsylvania Magazine of History and Biography, Vol. 48, No. 4 (1924).  This enabled the voter to compare the text of the proposed amendment with the text of the extant 1790 charter.

[25]  At that time, this constitutional provision read, in full:

> Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives; and, if the same shall be agreed to by a majority of the members elected to each House, such proposed amendment or amendments shall be entered on their journals with the yeas and nays taken thereon, and the Secretary of the Commonwealth shall cause the same to be published, three months before the next general election, in at least two newspapers in every county in which such newspapers shall be published; and if, in the General Assembly next afterwards chosen, such proposed amendment or amendments shall be agreed to by a majority of the members elected to each House, the Secretary of the Commonwealth shall cause the same again to be published in the manner aforesaid; and such proposed amendment or amendments shall be submitted to

was unaltered for the next 93 years.

In 1967 – a watershed year for constitutional change in Pennsylvania – the General Assembly considered a number of proposed revisions to our Constitution, and ultimately passed legislation authorizing the calling for a constitutional convention to conduct an in-depth consideration of some of them. These included: making fundamental changes to the manner in which the then-extant constitution governed legislative apportionment, judicial administration, the organization of local governments, taxation, and any amendment "proposed but not approved at the May 1967 primary." Act of Mar. 15, 1967, P.L. 2, No. 2, § 7.

One of the amendments which was proposed by the General Assembly during 1967, and approved by the voters of the Commonwealth in the May primary of that year, is the current version of Article XI, § 1, in which the language of the main section of Article XI, § 1 was changed from "amendments or amendment" to simply "amendment." The most important change, as noted previously, *see supra* note 22, was the addition of present paragraphs a and b of Article XI, providing for an accelerated procedure to amend the Constitution in the event a "major emergency threatens or is about to threaten the Commonwealth, and if the safety or welfare of the Commonwealth requires prompt amendment of this Constitution." Pa. Const. art. XI, § 1(a). Notably, these provisions also require that, whenever more than one emergency amendment is presented to the

the qualified electors of the State in such manner, and at such time at least three months after being so agreed to by the two Houses, as the General Assembly shall prescribe; and, if such amendment or amendments shall be approved by a majority of those voting thereon, such amendment or amendments shall become a part of the Constitution; but no amendment or amendments shall be submitted oftener than once in five years. When two or more amendments shall be submitted they shall be voted upon separately.

Pa. Const. art. XVIII, § 1 (1874-1967).

voters for approval, the voters must vote on them "separately." *Id.* § 1(b).

A review of the floor debates surrounding the passage of this amendment in the General Assembly reveals that the principal point of contention between those who supported its passage and those who opposed it was whether the provisions of the existing Constitution were adequate for our Commonwealth's government to mount an effective response in the event of a catastrophic event like a nuclear war or natural disaster. See Legislative Journal, *Pennsylvania House of Representatives*, 84-88 (Jan. 30, 1967). However, at no time during these debates did any legislator indicate an intent to relax the separate vote requirement established in 1838 and continued in the 1874 Constitution. *See id.* Indeed, we find it significant that the General Assembly, when considering the necessity of emergency amendment procedures to address sudden and severe existential calamities such as nuclear attack, nonetheless deemed the separate vote requirement to be of such importance that they included it as a requirement even for the adoption of a proposed emergency amendment. Critically, the voters signified their assent by approving these provisions.

We consider these developments to be a strong indication of the continuing essential importance of the separate vote requirement in our Commonwealth's constitutional amendment process. Consequently, we interpret and apply this requirement consistent with the intent of the framers of the 1838 Constitution: to prevent the pernicious practice of logrolling.

### *C. Caselaw*

In delineating the parameters of our subject matter test which best effectuates this overarching purpose of Article XI, § 1 to prevent logrolling, we also find it instructive to briefly examine formulations of that test utilized by the high courts of our sister states for enforcement of provisions of their constitutions, which are the same as, or substantially

similar to, Article XI, § 1 in requiring that more than one proposed amendment be presented separately to their voters.[26] Of greatest relevance, in our view, are the tests employed by the high courts of 14 of those states which have specifically identified the prevention of the practice of logrolling as a primary purpose for their constitutions' separate vote requirements.[27] [28] These tests are by no means uniform.

The tests utilized by the high courts in four of those states employ a loose and deferential standard, which examines whether the various provisions of a proposed amendment make changes to the constitutions of those states that are reasonably related, or germane, to a common theme or subject, but they do not require that the provisions function in an interrelated manner to achieve that common purpose. *See Californians for an Open Primary v. McPherson*, 134 P.3d 299, 327 (Cal. 2006) (requiring "only a showing that the challenged provisions are reasonably germane to a common

---

[26] By our count, at present, there are 27 states with such "separate vote" requirements in their constitutions. *See* Arizona Const. art. 21, § 1; Arkansas Const. art. 19, § 22; California Const. art. 18, § 1; Colorado Const. art. 19, § 2; Georgia Const. art. 10, § 1, Idaho Const. art. 20, § 2; Indiana Const. art. 16, § 2; Iowa Const. art. 10, § 2; Kansas Const. art. 14, § 1; Kentucky Const. § 256; Louisiana Const. art. 13, § 1; Maryland Const. art. 14, § 1; Minn. Const. art. 9, § 1; Miss. Const. art. 15, § 273; Missouri Const. art. 12, § 2(b); Mont. Const. art. 14, § XI; Nebraska Const. art. 16, § 1; New Jersey Const. art. 9, § 5; New Mexico Const. art. 19, § 1; Ohio Const. art. 16, § 1; Oklahoma Const. art. 24, § 1; Oregon Const. art. 17, § 1; Tenn. Const. art. XI, § 3; Washington Const. art. 23, § 1; West Virginia Const. art. 14, § 2; Wisconsin Const. art. 12, § 1; and Wyoming Const. art. 20, § 2.

[27] These are Arizona, California, Georgia, Idaho, Maryland, Minnesota, Missouri, Montana, Nebraska, New Jersey, New Mexico, Ohio, Oregon, and Washington.

[28] As explained previously, see *supra* note 10, because Utah amended its constitution in 1969 to remove the separate vote requirement from its constitution, we do not include the case of *Lee v. State,* 367 P.2d 861 (Utah 1962) in this discussion, as it no longer has any viability for comparison purposes. Likewise, as we highlighted previously, *see supra* note 12, Florida's Constitution contains no requirement that when two or more amendments are proposed by the legislature they must be voted on separately; thus, the case from the Florida Supreme Court cited in our *Grimaud* decision, *Fine*, *supra*, will not be included in this survey, as it has no relevance.

theme, purpose or subject," but expressly rejecting a requirement of an additional "showing of 'close' or 'functional' relatedness"); *Fugina, supra* (Minnesota) ("[P]ropositions that might be submitted separately may be submitted in a single proposal if they are rationally related to a single purpose, plan, or subject."); *Fulton County v. City of Atlanta*, 825 S.E.2d 142, 146 (Ga. 2019) ("courts to determine whether all of the parts . . . of the constitutional amendment are germane to the accomplishment of a single objective" (citation and internal quotation marks omitted)); *State ex rel. Willke v. Taft*, 836 N.E.2d 536, 541 (Ohio 2005) ("[A] proposal consists of one amendment to the Constitution only so long as each of its subjects bears some reasonable relationship to a single *general* object or purpose." (emphasis original)).

Ten of the remaining 14 states, however, require interdependence between the constitutional changes various provisions of a proposed amendment would make in order for it to comply with their constitutions' separate vote requirement. The genesis for this requirement was the seminal case of *Kerby*, *supra*, in which the Arizona Supreme Court explained how this requirement was to be applied in examining the provisions of a proposed constitutional amendment, as well as the vital role of this requirement in safeguarding its electorate against logrolling:

> If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition.

*Kerby*, 36 P.2d at 554. The court deemed this requirement necessary to ensure that the decision of the voters on the proposed amendment would truly be the result of their "free and mature judgment" by ensuring they are not "constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire." *Id.*

The Arizona Supreme Court continues to examine the interrelatedness of various provisions of proposed constitutional amendments in order to determine their compliance with the separate vote requirement of its constitution, albeit with some slight enhancement of the *Kerb*y test. For example, in *McLaughlin v. Bennett*, 238 P.3d 619 (Ariz. 2010), the court reiterated that it continues to "examine whether provisions of a proposed amendment are sufficiently related to a common purpose or principle that the proposal can be said to 'constitute a consistent and workable whole on the general topic embraced,' that, 'logically speaking . . . should stand or fall as a whole.'" *Id.* at 622. However, the court also highlighted four specific factors it now considers in determining whether the provisions of a particular amendment are "sufficiently interrelated" so as to "form a consistent and workable proposition":

> whether various provisions are facially related, whether all the matters addressed by [the proposition] concern a single section of the constitution, whether the voters or the legislature historically has treated the matters addressed as one subject, and whether the various provisions are qualitatively similar in their effect on either procedural or substantive law.

*Id.*

In addition to Arizona, nine states apply similar tests which are based on the interdependence requirement set forth in *Kerby*. These states require that, in order for a proposed amendment to comply with the separate vote requirements of their respective constitutions, all of the proposed changes must be both connected to each other and

dependent on each other, such that the changes, if implemented, will function as part of an integrated whole. *See Andrews v. Governor of Maryland*, 449 A.2d 1144, 1150 (Md. 1982) (requiring that the proposed changes must be "functionally interrelated," and their connection and interdependence must be such that they "constitute a consistent and workable whole."); *State ex rel. Clark v. State Canvassing Board*, 888 P.2d 458, 462 (N.M. 1995) ("[I]n order to constitute a single proposition or question there must exist a natural relationship between the objects covered by the ballot so that they form but one rounded whole or single plan" –  characterizing this required connection as a "rational linchpin of interdependence."); *State ex rel. Board of Fund Commissioners v. Holman*, 296 S.W.2d 482, 488 (Mo. 1956) (requiring that the changes be "so related that, united, they form in fact but one rounded whole," in order to be submitted to the voter as one proposition); *Idaho Watersheds Project v. State Board of Land Commissioners*, 982 P.2d 358, 363 (Id. 1999) (determining whether each change is "controlled, modified or qualified" by the other changes, and, if "the matters are 'incongruous and essentially unrelated'" such that they "do not in any way depend upon one another," then the amendment does not meet the separate vote requirement (citation omitted)); *Ferris v. Munro*, 662 P.2d 821, 825 (Wash. 1983) (separate vote requirement is violated if the proposition submitted to the voters relates to "more than one subject, and [has] at least two distinct and separate purposes not dependent upon or connected with each other"); *Loontjer v. Gale*, 853 N.W.2d 494, 513 (Neb. 2014) (requiring elements of a proposed constitutional amendment to have a "natural and necessary connection with each other and together [be] part of one general subject." (emphasis deleted)).

The high courts of New Jersey, Oregon and Montana, also follow the principles of *Kerby* in requiring interdependence between constitutional changes in a proposed amendment, based on their respective conclusions that such a test best effectuates the

intent of the framers of their states' constitutions to protect voters from logrolling. In addition, these states also specifically require a close degree of interrelatedness between any constitutional changes a proposed amendment would effectuate. *See Cambria, supra* (New Jersey) ("Put simply, to meet the separate vote requirement of the New Jersey Constitution, any proposed amendment must not make two or more changes to the constitution unless they are closely related to one another."); *Armatta v. Kitzhaber*, 959 P.2d 49, 64 (Or. 1998) ("[T]he proper inquiry is to determine whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and that are not closely related. If the proposal would effect two or more changes that are substantive and not closely related, the proposal violates the separate-vote requirement of [the Oregon Constitution], because it would prevent the voters from expressing their opinions as to each proposed change separately."); *Montana Association of Counties v. State by & through Fox,* 404 P.3d 733, 742 (Mont. 2017) ("[T]he proper inquiry is whether, if adopted, the proposal would make two or more changes to the Constitution that are substantive and not closely related.").

### D. Governing Test

As discussed above, *Grimaud*'s subject matter test requires a court asked to determine whether a proposed constitutional amendment violates Article XI, § 1 to examine whether the proposed amendment makes multiple changes to the Constitution, and, if so, whether those changes "are sufficiently interrelated to justify their presentation to the electorate in a single question." *Grimaud*, 865 A.2d at 841-42. This is the principal inquiry. *Grimaud* also indicates, however, that a proposed constitutional amendment may nevertheless violate Article XI, § 1 if it effectuates more than one substantive change. *Id.*

at 845.[29]

[29] While we held in *Grimaud* that a proposed amendment which makes only one substantive change to the Constitution did not trigger the separate vote requirement, we emphasize that a determination of whether there is, in actuality, only one substantive change rests on a careful examination of the practical effects the proposed change will have on existing constitutional provisions. Therefore, the fact that a proposed amendment *textually* appears to make only one change to Constitution is not dispositive; rather, the question is whether the practical impact of the single proposed change, in actuality, affects multiple constitutional provisions. For example, a proposed amendment that repealed Article I of the Constitution would unquestionably have multiple substantive effects by, in essence, repealing each of the various amendments contained within that article.

It is for this reason that we reject the argument of Appellees, which has been embraced by the dissent. *See* Dissenting Opinion (Mundy, J.), at 7-8. The dissent interprets our statement in *Grimaud* that changes to the Constitution made by a proposed amendment must "facially" or "patently" change other portions of the Constitution, *Grimaud*, 865 A.2d at 842, 845, as requiring that, in order for a proposed amendment to have a substantive effect on existing provisions of the Constitution, it must facially change the actual text of those provisions, or specifically refer to them. Amendments which expressly add text to, delete text from, or modify the language of existing provisions of the Constitution do, of course, substantively affect those provisions. However, this is not the only way a proposed amendment may make substantive changes to constitutional provisions. As the high court of Montana cogently observed in rejecting a similar interpretation of the single vote requirement of its constitution, "our reasoning would be fundamentally flawed if we limited the separate-vote requirement to only those multifarious amendments which expressly refer to other constitutional provisions. Such an interpretation would allow the separate-vote requirement to be easily undermined by simple drafting techniques." *Montana Association of Counties*, 404 P.3d at 741.

The constitutional right of the voters secured by Article XI, § 1 – to be protected from logrolling in voting on constitutional changes – is, as we have established, fundamental; consequently, in determining whether this right has been denied, "we must look at the substance of things rather than mere form." *Commonwealth ex rel. Smith v. Patterson*, 187 A.2d 278, 279 (Pa. 1963). In accordance with this principle, *Grimaud* indicated that the dispositive consideration in this determination is whether the changes to other constitutional provisions made by a proposed amendment are "substantive" or "substantial." *Grimaud*, 865 A.2d at 842, 845. Thus, *Grimaud*'s use of the terminology "facially affect" or "patently affects," *id.*, must be understood as requiring that the substantive changes be facially or patently *apparent*, *i.e.*, readily discernable from an examination of the language of the proposed amendment and the text of the existing Constitution. This requirement ensures that reviewing courts consider the proposed amendment from the perspective of the voter.

Thus, in determining whether a proposed amendment would make substantive changes to the Constitution, a reviewing court must assess whether the amendment, if implemented, would materially alter the manner in which an existing constitutional

Regarding *Grimaud*'s principal inquiry – assessing whether the multiple changes to the Constitution, either in the form of entirely new provisions or the alteration of existing provisions, are sufficiently interrelated – we will follow the lead of Arizona and the majority of our sister jurisdictions in requiring that such multiple changes be interdependent, or as the Maryland high Court termed it in *Andrews*, "functionally interrelated." *Andrews,* 449 A.2d at 1150. Thus, each change to our Constitution contained in a proposed amendment must, when viewed together, form an interlocking package necessary to accomplish one overarching objective, such that the amendment "stand[s] or fall[s] as a whole." *Kerby*, 36 P.2d at 554. If any of the multiple changes in a proposed amendment are independent of the others, and could stand alone, then Article XI, § 1 requires that they be presented separately to the voters so that they may individually vote on those changes.

We conclude that this "functionally interrelated" standard best effectuates the paramount objective of the framers of Article XI, § 1, and the voters of this Commonwealth who ratified it, to protect the voters' fundamental right to make a "free and mature judgment" in making the momentous decision as to whether to alter their Constitution. *Id.* It safeguards against the pernicious practice of logrolling, which the framers deliberately sought to thwart, because it enables voters to make a genuinely free and deliberative evaluation of each change a proposed amendment will make to their Constitution, ensuring that they are able to fully perceive, and therefore fully evaluate, how those

_____

provision functions. This would include, for example, examining: whether the proposed amendment will materially alter rights which are secured by an existing provision, such as by expanding, contracting, or qualifying such rights; whether the proposed amendment will materially alter existing constitutionally-mandated procedures for the protection or exercise of constitutionally guaranteed rights; or whether the proposed amendment will materially alter the powers or duties of the coequal branches of our Commonwealth's government in the administration of procedures which impact constitutional rights.

changes would operate, together, to alter the overall form and operation of the government under which they will live thereafter.

We also consider this assessment to afford sufficient flexibility in the development of our Constitution in a positive manner, inasmuch as it ensures voters have the ability to readily discern, understand, and approve proposed amendments which they adjudge will make our Constitution and system of government better function to promote and advance their general welfare; this requirement also ensures that the voters can readily identify and reject proposed amendments which they conclude are detrimental to those objectives. It, thus, secures to voters their sacrosanct right to fully and accurately express their personal preferences on these vital matters of governance.

Accordingly, in sum, we hold that the subject matter test of Article XI, § 1 requires a court, when reviewing a challenge to a proposed amendment making multiple changes to our Constitution – either through the addition of new provisions to our organic charter, or through the alteration of its existing provisions – to examine whether these changes function in an interrelated fashion to accomplish one singular objective, which means that it must determine whether the changes depend on one another for the fulfillment of that objective. If the changes the proposed amendment would make do not have this requisite interrelationship, the proposed amendment must be stricken as violative of the clear mandates of Article XI, § 1.

*E. Application*

Having set forth the governing test, we now apply it to the amendment at issue here, the proposed Victim's Rights Amendment. We requote the amendment in full:

§ 9.1. Rights of victims of crime.

(a) To secure for victims justice and due process throughout the criminal and juvenile justice systems, a victim shall have the following rights, as further provided and as defined by the General Assembly, which shall be protected in

a manner no less vigorous than the rights afforded to the accused: to be treated with fairness and respect for the victim's safety, dignity and privacy; to have the safety of the victim and the victim's family considered in fixing the amount of bail and release conditions for the accused; to reasonable and timely notice of and to be present at all public proceedings involving the criminal or delinquent conduct; to be notified of any pretrial disposition of the case; with the exception of grand jury proceedings, to be heard in any proceeding where a right of the victim is implicated, including, but not limited to, release, plea, sentencing, disposition, parole and pardon; to be notified of all parole procedures, to participate in the parole process, to provide information to be considered before the parole of the offender, and to be notified of the parole of the offender; to reasonable protection from the accused or any person acting on behalf of the accused; to reasonable notice of any release or escape of the accused; to refuse an interview, deposition or other discovery request made by the accused or any person acting on behalf of the accused; full and timely restitution from the person or entity convicted for the unlawful conduct; full and timely restitution as determined by the court in a juvenile delinquency proceeding; to the prompt return of property when no longer needed as evidence; to proceedings free from unreasonable delay and a prompt and final conclusion of the case and any related postconviction proceedings; to confer with the attorney for the government; and to be informed of all rights enumerated in this section.

(b)  The victim or the attorney for the government upon request of the victim may assert in any trial or appellate court, or before any other authority, with jurisdiction over the case, and have enforced, the rights enumerated in this section and any other right afforded to the victim by law.  This section does not grant the victim party status or create any cause of action for compensation or damages against the Commonwealth or any political subdivision, nor any officer, employee or agent of the Commonwealth or any political subdivision, or any officer or employee of the court.

(c)  As used in this section and as further defined by the General Assembly, the term "victim" includes any person against whom the criminal offense or delinquent act is committed or who is directly harmed by the commission of the offense or act.  The term "victim" does not include the accused or a person whom the court finds would not act in the best

interests of a deceased, incompetent, minor or incapacitated victim.

Joint Resolution 2019-1.

Patently, this proposed amendment adds numerous new and broad constitutional rights for victims to the Pennsylvania Constitution, which anyone meeting the Amendment's expansive definition of victim "may assert in any trial or appellate court, or before any other authority with jurisdiction over the case."[30]  *Id.*  Some of these rights include the right to:

- o to be treated with fairness and respect for the victim's safety;

- o to have the safety of the victim and the victim's family considered in fixing bail and release conditions;

- o to notice of and to be present at all public proceedings for the defendant or delinquent;

- o to be notified of any pretrial disposition;

- o to be heard in any proceeding implicating a victim's right, including release, plea, sentencing, disposition, parole, and pardon;

- o to participate in the parole process;

- o to be notified of the parole of the offender;

- o to reasonable protection from the accused or any person acting on behalf of the accused;

- o to reasonable notice of any release or escape of the accused;

- o to refuse an interview, deposition, or other discovery request by the accused;

- o to full and timely restitution and the return of property;

---

[30] The amendment defines a victim as "any person against whom the criminal offense or delinquent act is committed or who is directly harmed by the commission of the offense." Joint Resolution 2019-1.

o to proceedings free from unreasonable delay;

o to a prompt and final conclusion of the case and any postconviction proceedings; and

o to confer with the attorney for the government.

In our view, it is manifest that these separate new rights are not dependent on each other to be effective. To cite but a few examples, the right of a victim to restitution does not depend on the right of the victim to be informed of, and to participate in, parole proceedings. The right of a victim to be treated with respect for his or her privacy does not depend on the right of a victim to be heard in proceedings involving release, plea, sentencing, disposition, parole and pardon. The right of a victim to proceedings free from unreasonable delay does not depend on the right of the victim to refuse a pretrial discovery request, or the right to be notified of the escape of an accused. Many or all of these newly enumerated rights are independent of the others, and could operate independently. In short, they are not functionally interrelated. Indeed, we can easily envision a voter supporting one or more of these rights without approving of all of them. Consequently, Article XI, § 1 required the voters to have been given the opportunity to vote separately on each of them.

While that concludes our inquiry, regarding *Grimaud*'s proviso that a proposed constitutional amendment may nevertheless violate Article XI, § 1 if it effectuates more than one substantive change to the Constitution, we note that the Victim's Rights Amendment fails that test as well, as it substantively alters the manner in which a wide variety of existing constitutional provisions function. Three of the more significant changes illustrate the point. These newly conferred victim's rights, which the Amendment specifically provides "shall be protected in a manner no less vigorous than the rights afforded to the accused," Joint Resolution 2019-1, would alter the following provisions of

our charter:  the right of an accused to bail under Article I, § 14; the exclusive grant to our Court of the power to create rules of procedure within the courts of this Commonwealth under Article V, § 10(c); and the power of the Governor to issue pardons under Article IV, § 9.

With respect to the change the proposed Victim's Rights Amendment makes to the right of an accused to bail, Article I, § 14 currently specifies:

> All prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great.

Pa. Const. art. I, § 14.  Notably, the amendment imposes the following additional condition on the granting of bail:  that a victim of a crime has the right to "have the safety of the victim and the victim's family considered in fixing the amount of bail and release conditions for the accused."   Joint Resolution 2019-1.   We find that this additional condition substantively alters the manner in which Article I, § 14 governs the bail process.  At present, an individual accused of a crime (except for individuals falling within the enumerated exceptions) is entitled to "be bailable by sufficient sureties," and a court of this Commonwealth determines the amount of surety required to secure the presence of an accused at trial.  However, under the proposed Victim's Rights Amendment, a court, when imposing bail, would also need to determine whether the amount of bail chosen will be sufficient to secure the safety of the victim and the victim's family.  Moreover, the Victim's Rights Amendment authorizes a court, when setting bail, to impose *additional* "release conditions" beyond merely requiring cash security.  We deem these to be substantive changes to the bail process established by Article I, § 14.

Next, with respect to the changes the proposed Victim's Rights Amendment makes to our Court's exclusive authority to promulgate rules of procedure for the courts of this

Commonwealth under Article V, § 10(c),[31] the amendment grants to the General Assembly the express power to "further provide" and "define" victim's rights. Joint Resolution 2019-1. Those enumerated rights include the right to participate in court proceedings in criminal matters and the manner in which such participation would occur. Clearly then, this provision would substantively alter this Court's power under Article V, § 10(c), and would grant the legislature the authority to supplant our existing rules governing court proceedings, insofar as they pertain to proceedings involving victims.

Finally, we address how the Victim's Rights Amendment would substantively alter Article IV, § 9, which delineates the Governor's pardon power.[32] Presently, under this provision, except for criminal offenses in which a penalty of death or life imprisonment is imposed, the Governor may grant a pardon upon the written recommendation of a majority of the Board of Pardons. However, the Victim's Rights Amendment confers on any individual who meets its definition of victim, which, as discussed above, includes anyone who has been "directly harmed" by a crime, a right "to be heard in any proceeding" including pardon proceedings. Joint Resolution 2019-1. Thus, under the Victim's Rights Amendment, the Governor would be prohibited from exercising his pardon power until

---

[31] We have quoted the text of Article V, § 10(c) in full above. *See supra* note 9.

[32] Article IV, § 9(a) provides, in relevant part:

> In all criminal cases except impeachment the Governor shall have power to remit fines and forfeitures, to grant reprieves, commutation of sentences and pardons; but no pardon shall be granted, nor sentence commuted, except on the recommendation in writing of a majority of the Board of Pardons, and, in the case of a sentence of death or life imprisonment, on the unanimous recommendation in writing of the Board of Pardons, after full hearing in open session, upon due public notice. The recommendation, with the reasons therefor at length, shall be delivered to the Governor and a copy thereof shall be kept on file in the office of the Lieutenant Governor in a docket kept for that purpose.

Pa. Const. art IV, § 9(a).

and unless all individuals who meet these criteria are granted the right "to be heard," which conceivably includes the right to be heard by the Governor himself and/or the Board of Pardons. We, therefore, deem this restriction placed on the Governor's pardon power to be a substantive change to Article IV, § 9.

These substantive changes, like the litany of new enumerated rights themselves, are not sufficiently interrelated so as to justify having been presented to the electorate in a single vote. In our view, for example, bail conditions could have been revised without also altering the Governor's pardon power. Likewise, altering the Governor's pardon power does not depend on also altering this Court's authority to promulgate procedural rules for the courts of this Commonwealth.

In sum, then, we conclude that the array of wide-ranging changes to the Pennsylvania Constitution made by the Victim's Rights Amendment were not dependent on each other in order to function and thereby effectuate the overarching subject of this amendment, the protection of victim's rights. Consequently, Article XI § 1 prohibited them from being joined together as a singular proposed amendment, because doing so denied the voters of this Commonwealth their right to vote on each change separately, a sacrosanct right that provision of our organic charter of governance guarantees.

## IV. Conclusion

We, therefore, affirm the order of the Commonwealth Court declaring that the proposed Victim's Rights Amendment violated Article XI, § 1, and enjoining the Secretary of the Commonwealth from tabulating and certifying the results of the November 5, 2019 General Election regarding that proposed amendment.

Chief Justice Baer and Justices Saylor, Donohue, Dougherty and Wecht join the opinion.

Justice Mundy files a dissenting opinion.